**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| **JASON BREWER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **CASE NO. 3:08-cv-1343-SLB** |
| | } | |
| **TIFFIN MOTORHOMES, INC.,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is currently before the court on defendant Tiffin Motorhomes, Inc.'s

("Tiffin") Motion for Summary Judgment. (Doc. 17.)[1]  Upon consideration of the record,

the submissions of the parties, the arguments of counsel, and the relevant law, the court is

of the opinion that Tiffin's Motion for Summary Judgment, (doc. 17), is due to be granted

in part and denied in part.  The Motion will be granted as to plaintiff's claim that

defendant violated ADA medical examination and inquiry provisions.  The remainder of

defendant's Motion will be denied.

**Case Overview**

In his Complaint, plaintiff Jason Brewer ("Brewer") alleges that Tiffin terminated

his employment based upon a perception of disability, either because of his psychiatric

conditions or an alleged drug addiction, in violation of the Americans with Disabilities

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

Act, 42 U.S.C. §§ 12101 et seq.  (Doc. 1.)  Brewer's Amended Complaint additionally

asserts that Tiffin violated section 12112(d) of the ADA, which governs medical

examination and inquiry.  (Doc. 13.)  In Count Two of his Amended Complaint, Brewer

primarily contends that Tiffin 1) administered a drug test from which it obtained medical

information related to Brewer's psychiatric condition; 2) interpreted data contained in the

report without the assistance of a qualified professional; and 3) violated its duty to keep

Brewer's medical information confidential.  (Doc. 13, ¶¶ 12-23.)  Tiffin asserts it

terminated Brewer because he was impaired while working, which caused a threat to

worker safety, and Tiffin appropriately administered a reasonable suspicion drug test and

adhered to confidentiality requirements.  Tiffin, therefore, seeks an entry of judgment in

its favor.

## I.  SUMMARY JUDGMENT STANDARD[2]

Summary judgment is appropriate when the record shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no

genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See*

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule

---

[2]As required when evaluating a motion for summary judgment, the court states the facts
and all reasonable inferences arising from them in the light most favorable to Brewer, the
nonmoving party.  *See, e.g., Allen* v.*Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)
(citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted)).

56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Evans v. Stephens*, 407 F.3d 1272, 1284 (11th Cir. 2005) (Carnes, J., concurring specially) (quoting *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)).

## II.  STATEMENT OF FACTS

During the period of time in which Tiffin employed Brewer, Tiffin utilized Snelling Staffing to fill temporary positions.  (Doc. 19, Ex. A, p. 28, Brewer Depo.) Tiffin's practice was to hire Snelling temporaries as permanent Tiffin employees after a set period of temporary employment.  (*Id.*)  On July 19, 2006, Brewer filled out a two-page Snelling application.  (Doc. 22-5, Ex. P, Snelling Employment Application.)

3

Brewer began working for Snelling at Tiffin's Red Bay Alabama plant ("the plant") on

September 9, 2006.  (Doc. 19, Ex. A, pp. 31-32, Brewer Depo.)  As a Snelling employee,

Brewer worked on a production line building wooden table tops and cabinet doors.  (*Id.*,

p. 33.)

On November 10, 2006, Brewer became a Tiffin employee and continued working

on the same production line.  (*Id.*, pp. 32, 34, 35.)  In the spring of 2007, Tiffin's

Warehouse Supervisor, Charles Inman ("Inman"), stepped down from his position to

work in the warehouse as a non-supervisory receiving employee.  (Doc. 21-3, Ex. E, pp.

12-13, Brad Witt Depo.; Doc. 22-2, Ex. M, at ¶¶ 1, 8, Inman Decl.)  In response, Tiffin

developed a job posting for the Warehouse Supervisor position and posted it internally to

encourage internal applicants for the position.  (Doc. 22, Ex. L at ¶¶ 2-3, 6, Tony Riley

Decl.)  The job posting provided a general description of the position's duties and

described the position's essential functions.  (*Id.* at ¶ 6; Doc. 22-6, Job Posting.)

Brewer applied for, and was selected from among several applicants for the

Warehouse Supervisor position following interviews with Tiffin's Director of

Engineering, Brad Witt ("Witt"), Tiffin's Plant Manager, Tim Massey ("Massey"), and

Tiffin's President, Tim Tiffin ("Mr. Tiffin"[3]).  (Doc. 19, Ex. A, pp. 38-39, Brewer Depo.;

Doc. 21-3, Ex. E, pp. 10-11, Witt Depo.; Doc. 21-2, Ex. D, pp. 5-6, Tim Tiffin Depo.;

Doc. 21-4, Ex. F, p. 73, Massey Depo.)  Brewer assumed his supervisory role at some

---

[3] For clarity, the court will hereinafter refer to defendant Tiffin Motorhomes as "Tiffin" and to its President, Tim Tiffin, as "Mr. Tiffin."

point in April 2007.  (Doc. 19, Ex. A, p. 69, Brewer Depo.; Doc. 22-7, Ex. R, Brewer

EEOC Charge of Discrimination, p. 3 at ¶ 1.)

**Brewer's Performance as Warehouse Supervisor**

Brewer described his duties as Warehouse Supervisor as controlling shrinkage,

organizing the warehouse flow to increase productivity, and facilitating the delivery of

parts to the production line.  (Doc. 19, Ex. A, pp. 39-41, Brewer Depo.)  Under the

heading of "General Job Description," the Warehouse Supervisor Job Posting indicates

that one of the supervisor's duties is to "suggest changes in workplace conditions and use

of equipment to increase efficiency of shop, department, or work crew."  (Doc. 22-6, Ex.

Q.)  Upon promotion to the Warehouse Supervisor position, Brewer undertook several

modifications of the warehouse and its office which included 1) relocating a closed circuit

monitor to a space within his cubicle from which he could observe the warehouse, (doc.

22-3, Ex. N at ¶ 10, Shewbart Decl.); installing a PA system in the warehouse,[4] so that he

could communicate with his employees while sitting in his cubicle, (doc. 21-7, Ex. I, pp.

16-17, Miller Depo.; Doc. 22-3, Ex. N at ¶ 11, Shewbart Decl.); using excess counter-top

material to create shelving in his cubicle and a divider in the men's restroom, (doc. 21-7,

Ex. I, p. 19, Miller Depo.; Doc. 22-3, Ex. N at ¶ 12, Shewbart Decl.); and making repairs

and/or modifications to the golf cart that was used in the warehouse, (doc. 21-5, Ex. G,

_____

[4]The warehouse PA was independent of the plant intercom.  (Doc. 21-7, Ex. I, pp. 16-17, Miller Depo.)  Installation of the system required mounting a speaker to a pole above his office, and purchasing a new CB radio.  (Doc. 21-7, Ex. I, pp. 16-17, Miller Depo.; Doc. 22-3, Ex. N at ¶ 11, Shewbart Decl.; Doc. 19, Ex. A, pp. 92-94, Brewer Depo.)

5

pp. 39-40, Shewbart Depo.; doc. 22-3, Ex. N at ¶ 13, Shewbart Decl.).

Also listed in the Warehouse Supervisor Job Posting was a requirement that the candidate possess behavioral traits consistent with a "high level of productivity and quality and safety." (Doc. 22-6, Ex. Q.)  Brewer acknowledged that safety "was of importance" in the warehouse, and that workers utilized numerous vehicles while working in the warehouse, among them forklifts, golf carts, and a tug or small industrial tractor.  (*Id.*, pp. 45-47, 52, 55, 56.)  Brewer drove the golf cart assigned to the warehouse, using it to perform many of his duties.  (Doc. 21-5, Ex. G, pp. 39-40, Shewbart Depo.)  Danny Shewbart ("Shewbart"), an employee then under Brewers's supervision,[5] was of the opinion that Brewer drove the golf cart too fast, and, fearing an accident, he warned other warehouse employees to watch out for Brewer when he was driving the golf cart.  (*Id.*, pp. 51-54, 58.)  Tiffin's Human Resource Director, Tony Riley ("Riley") testified that of those warehouse employees who worked under Brewer, none reported Brewer's alleged golf cart "speeding" prior to Brewer's termination.  (Doc. 20, Ex. B, pp. 177-178, 181-182, Riley Depo.)  *After* Brewer's termination Miller and Shewbart reported to Riley that Brewer ran the golf cart into the side of the warehouse office.  (*See* Doc. 21-3, Ex. E, pp. 36-38, Witt Depo.; Doc. 21-7, Ex. I, p.52, Miller

---

[5]  Danny Shewbart worked in the warehouse, under Brewer's supervision, and replaced Brewer as Warehouse Supervisor after Brewer's termination.  (Doc. 21-5, Ex. G, pp. 5-8, Shewbart Depo.)

Depo.; Doc. 20, Ex. B, pp. 181-82, Riley Depo.)[6]  Warehouse employee Deshawn Miller

("Miller") testified that Brewer drove the cart "too fast" or "out of control for the

environment that we were in."  (Doc. 21-7, Ex. I, p. 52, Miller Depo.)  Brewer admits to a

single incident of driving the cart too fast, and claims it occurred in the moments after he

was fired, when he drove to the warehouse to get his belongings. (Doc. 26-7, Ex. 2 at

¶ 8, Brewer Decl.)  Brewer contends that, as a matter of course, he drove the cart in a safe

manner, and received no complaints about his driving.  (Doc. 26-7, Ex. 2 at ¶ 8.)

As an additional safety concern, defendant contends that Brewer instructed

warehouse employees to rearrange, or re-stack, large pieces of furniture, estimated to

weigh 300-400 pounds each.  (Doc. 21-4, Ex. F, pp. 43- 46, Massey Depo.)  Plant

Manager Massey stated that in the time frame between Brewer's drug test and his

termination one employee, Kevin Barker, expressed concern that following Brewer's plan

would cause him to hurt his back.[7]  (Id., pp. 44, 46.)  In contrast, Shewbart, Brewer's then

subordinate, understood that Mr. Barker's complaint centered on his thoughts that the

new plan would not give them as much room in the warehouse.  (Doc. 21-5, Ex. G, pp.

60-62, Shewbart Depo.)  Brewer contends that his proposed reorganization of furniture

did not raise a safety issue and that, in any event, no furniture was moved.  (Doc. 26-7,

---

[6]  Because defendant did not learn of the allegations regarding plaintiff allegedly driving
his golf cart too fast until after his termination, this evidence is not relevant now or at trial.

[7]  Although Massey was involved in the decision to terminate plaintiff, the court is of the
opinion that this evidence also has no relevance.  A reasonable jury could not find that this
evidence reflects impairment.

Ex. 2 at ¶11.)  Ultimately, the plan was not implemented – Massey instructed Brewer to "leave the furniture alone."  (Doc. 21-5, Ex. G, 46-47.)

After Brewer's termination, Tiffin became aware of another practice which it believed affected employee safety.  On his own initiative, Brewer used the forklift to move a large group of air conditioners, which were packaged in cardboard boxes, to the top shelf of one of the warehouse shelving units.  (*Id.*, pp. 17-18; Shewbart Depo.; Doc. 21-7, Ex. I, pp. 24-25, Miller Depo.)  Warehouse employees were aware that the cardboard packaging "does not stand up to a lot of pressure," and was prone to break down when several air conditioners were stacked on top of each other.  (Doc. 21-7, Ex. I, pp. 24-25, Miller Depo.)  For this reason, employees had always placed the air conditioners in low stacks along the wall of the warehouse, such that, if the containers collapsed, the units would merely shift toward the wall, as opposed to falling from the shelving.  (*Id.*)  Warehouse employee, Deshawn Miller ("Miller"), brought the matter to Brewer's attention and Brewer, in turn, directed Shewbart to take the air conditioners down.  (*Id.*, p. 25, Miller Depo.; Doc. 21-5, Ex. G, pp. 18-19, Shewbart Depo.; Doc. 21-4, Ex. F, p. 50, Massey Depo.)  Brewer contends that he moved the air conditioners as a space saving measure; and, because he was new to the warehouse, he was unaware of the particular hazards posed by the packaging and/or that the specific shelving that he used might not be as strong as other shelving within the warehouse.  (Doc. 21-7, Ex. 2 at ¶

10.)[8]

Brewer's supervisors, Massey and Witt, perceived him as doing a good job, and both acknowledge they never discussed job performance issues with Brewer. (Doc. 21-3, Ex. E, pp. 17-18, 61, 184-185, Witt Depo.; Doc. 19, Ex. A, pp. 70, 120-121, Brewer Depo.) Likewise, no job performance concerns were reported to Tim Tiffin or Riley prior to Brewer's termination. (Doc. 21-2, Ex. D, p. 59, Tiffin Depo.; Doc. 20, Ex. B, pp. 106, 116-117, Riley Depo.) When Brewer was fired both Massey and Witt told him he was doing a good job and that they were sorry. (Doc. 19, Ex. A, p. 127, Brewer Depo.) Tiffin also provided Brewer with a favorable recommendation to his next employer. (Doc. 21-3, Ex. E, p. 170, Witt Depo.)

**Brewer's Medical Condition**

Brewer has been diagnosed with Bipolar Disorder (Type II), Attention Deficit Disorder (ADHD), and Anxiety Disorder or Panic Disorder. (Doc. 26-13, Ex. 8, pp. 24-88, Anakwenze Depo.). Brewer takes various medications, as prescribed, for these conditions. (Doc. 22-13, Ex. X, Mills's medication and diagnoses list; Doc. 26-13, Ex. 8, pp. 30, 99-100, Anakwenze Depo.) Brewer's psychiatrist, Dr. Anakwenze, began treating

---

[8]The record is clear that this information did not factor into the termination decision. (Doc. 21-7, Ex. I, p. 8, Miller Depo.; Doc. 21-4, Ex. F, p. 49, Massey Depo.; Doc. 20, Ex. B, pp. 177-78, Riley Depo.) However, at oral argument of its Motion for Summary Judgment, defendant's counsel argued that this after-acquired information is pertinent to, and should be considered, in resolving the issue of whether Brewer can demonstrate that he is "otherwise qualified" to perform the job's essential functions, and thus satisfy a required prima facie element. The court is of the opinion that this information cannot be considered for this purpose, now or at trial.

Brewer in December of 2006.  (Doc. 26-13, Ex. 8, p. 10, Anakwenze Depo.)  Prior to that time, Brewer took Adderall, Lexapro, Concerta, and Niravam, a long acting form of Xanax.  (*Id.*, pp.12, 18-19.)  While Dr. Anakwenze did not initially change Brewer's medications, in March 2007 he introduced Lamictal and, as a cost saving measure, he prescribed Xanax in place of Niravam.  (*Id.*, pp.14, 23.)  Dr. Anakwenze testified that he has neither observed Brewer exhibit drowsiness or slurred speech while on his medications, nor been informed by Brewer that Brewer has experienced impairment, such as loss of motor control, while taking his medications.  (*Id.*, pp. 36, 83-84.)  According to Dr. Anakwenze, if a person has been taking these medications for a period of time, he will not likely experience drowsiness, however, if he is "new to the medication, he will be prone to, [for example], feeling drowsy in a meeting."  He further opined that Xanax, as opposed to Niravam, was more likely to cause drowsiness because it was not time released.  (*Id.*, p. 34.)

Brewer disclosed to Tiffin that he was taking prescription medications in conjunction with submitting to the drug test on May 9, 2007.[9]  (Doc. 19, Ex. A, pp. 114-115; Doc. 21, Ex. C, pp. 144-148, Mills Depo.)  Tiffin has a written substance abuse policy which requires disclosure of prescription drug use if the employee is in a "safety

---

[9]  Defendant points out the while Brewer recalls that he disclosed these medications to Snelling on his application, they do not appear on this document.  (Doc. 19, Ex. A, pp. 140-43, Brewer Depo.; Doc. 22-5, Ex. P, Snelling Employment Application.)  The court notes that the employment application neither requests, nor provides space for, a listing of the applicant's prescription medications, and further notes that this would violate the medical inquiry provisions stated in 42 U.S.C. § 12112(d)(2) (limiting preemployment inquiries to ability of the applicant to perform the job and allowing for medical examination only after an offer of employment).

sensitive" position and the medication is mind or mood altering or lists common side effects, such as drowsiness or lethargy.  (Doc. 22-8, Ex. S, Policy.)  The policy defines a "safety sensitive" position as one which involves "working at heights" or "operation of Company vehicles, machinery, or equipment."  (*Id.*)  Brewer did not consider his position to be "safety sensitive," and he denies being made aware, prior to May 9, 2007, that Tiffin requires disclosure of prescription drug use.  (Doc. 26-7, Ex. 2 at ¶¶ 4-5, Brewer Decl.)

### May 9, 2007 – Supervisor Training at Tiffin's Belmont, Mississippi Plant and Subsequent Drug Test

On May 9, 2007, at Tiffin's Belmont, Mississippi plant, supervisors from the Red Bay and Belmont plants participated in a supervisor training session, which was presented by an employee of Behavioral Health Systems and labeled "Recognizing and Assisting Troubled Employees."  (Doc. 19, Ex. A, pp. 76-77, 80, Brewer Depo.; Doc. 22-9, Ex T & Doc. 22-10, Ex. U, May 9, 2007 Class Handouts.)  Attendees received the training session handouts, which included information pertaining to troubled employees exhibiting extreme or dangerous behavior, as well as a reasonable suspicion checklist.  (Doc. 22-9, Ex. T, pp. 6, 21-22.)

During this meeting, several people noticed Brewer acting strangely, and/or exhibiting slurred or rambling speech.  (Doc. 21-4, Ex. F, pp. 61-66, Massey Depo.; Doc. 21-8, Ex. J, pp. 5-6, Pounds Depo.)  Brewer fell asleep several times during the presentation and jerked awake abruptly, opening his eyes widely.  (Doc. 21-6, Ex. H, p. 7, Lambert Depo.; Doc. 21-8, Ex. J, pp. 11-12, Pounds Depo.; Doc. 21-9, Ex. K, p. 7, Davis

Depo.)  Brewer's eyes were described as glassy and red.  (Doc. 20, Ex. B, pp. 272-73,

Riley Depo.; Doc. 21, Ex. C, pp. 97-98, Mills Depo.)  Brewer also asked several

questions which were rambling, slurred, repetitive, or not related to the topic just

presented.  (Doc. 21-4, Ex. F, pp. 61-63, Massey Depo.; Doc. 21-9, Ex. K, p. 7, Davis

Depo.; Doc. 21-6, Ex. H, pp. 7-8, Lambert Depo.)

   Tiffin served lunch during this meeting, setting out barbecue and tea in the back of

the conference room near where Susan Mills ("Mills"), Tiffin's company nurse, and Tony

Riley ("Riley"), Tiffin's Human Resource Director, were seated.  (Doc. 19, Ex. A, pp. 77-

78, Brewer Depo.; Doc. 21, Ex. C, p. 21, Mills Depo.)  Brewer got up from his seat on

more than one occasion to get tea from the back of the conference room, and at one point

had three cups of tea on the table in front of him.  (Doc. 21-8, Ex. J, p. 13, Pounds Depo.;

Doc. 21-9, Ex. K, p. 7, Davis Depo.)  Straws had been placed in the tea cups with a

portion of the paper covering still remaining over the drinking end.  (Doc. 21-8, Ex. J, pp.

7-8, Pounds Depo.)  Anthony Pounds was seated next to Brewer and noticed Brewer try

to drink one or more of these cups of tea without first removing the paper, even when he

appeared to look at his beverage glass.  (*Id.*, pp. 7-8, 19-20.)  Mills considered Brewer to

be "sluggish" while drinking his tea.  (Doc. 21, Ex. C, pp. 97-98, Mills Depo.)

   At the conclusion of the meeting, the Red Bay Plant supervisors drove back to the

Plant.  (Doc. 21-4, Ex. F, p. 72, Massey Depo.; Doc. 21-8, Ex. J, p. 24, Pounds Depo.;

Doc. 21-9, Ex. K, p. 9, Davis Depo.)  Mills remained for about one hour to clean up the

conference room.  (Doc. 21, Ex. C, p. 93.)  When Mills drove back to the Plant, she

happened to pull in behind Brewer, following him during the approximately seven-mile

drive back to Red Bay.  (*Id.*, pp. 104, 106-108, 121, Mills Depo.)  Mills saw Brewer

"swerve[] over into oncoming traffic and then on into the parking lot" of a Parade gas

station on the outskirts of Red Bay.  (*Id.*, p. 109.)  Mills stated that another car was

approaching and was "two to three car lengths" from Brewer when he passed in front it,

and she thought he was going to hit the car.  (*Id.*, pp. 109, 111.)  Mills did not observe

anything else that she considered significant while following Brewer, and she admits that

she considers herself to be a cautious driver.  (*Id.*, pp. 109-110.)  In reporting the incident

to Massey, Mills made no mention of Brewer "weaving or having any other problems

driving between Belmont and Red Bay."  (Doc. 21-4, Ex. F, pp. 82-83, Massey Depo.)

Based on observations of Brewer during the supervisor training meeting and

Mills's report about Brewer's driving, Riley, Massey, Witt, and Mills met at Nurse

Mills's station that afternoon and made the decision to require Brewer to take a drug test.

(Doc. 21-3, Ex. E, pp. 47-48, 54-56, Witt Depo.; Doc. 21-4, Ex. F, pp. 72-73, Massey

Depo.)  Massey and Witt went to the warehouse and walked with Brewer to the nurses

station; Massey noted that Brewer seemed "pretty normal" at that time, and that he

volunteered to take a drug test.  (Doc. 21-3, Ex. E, pp. 54-56, Witt Depo.; Doc. 21-4, Ex.

F, pp. 72-73, Massey Depo.)  Once at the nurse's station, Brewer responded to questions

about his return trip from Belmont and explained that his delay in returning to the Plant

13

was related to his stop at "Southeastern Surplus." (Doc. 19, Ex. A, pp. 110-114, Brewer Depo.) Brewer recalls being informed, at that meeting, that he was exhibiting behavior consistent with the behaviors described in the presentation at Belmont. (*Id.*) Brewer told Mills and the others about the medications that he was taking, although he could not specifically recall some of the names. (Doc. 19, Ex. A, pp. 114-115.) Following their discussion, Mills administered the drug test. (*Id.*, pp. 116-17; Doc. 20, Ex. B, p. 404, Riley Depo.)

Tiffin retained Brewer in his position while it awaited test results. (Doc. 21-4, Ex. F, pp.69-71, Massey Depo.) In the days following the drug test, Mr. Tiffin, Riley, and Massey observed Brewer fall asleep at two or more of the brief daily production meetings, attended by supervisors at 8:00 a.m. each morning. (Doc. 21-2, Ex. D, pp. 16-20, Tiffin Depo.; Doc. 20, Ex. B, pp. 137-41, Riley Depo.; Doc. 21-4, Ex. F, pp. 85-86, Massey Depo.) Riley also noted that Brewer stood in the meetings and swayed back and forth. (Doc. 20, Ex. B, p. 137, Riley Depo.) Massey, on the other hand, remembers that Brewer was seated during the meetings. (Doc. 21-4, Ex. F, p. 99, Massey Depo.) Witt considered Brewer's comments in the meetings to be "illogical" in that they were long, as opposed to "short and straight to the point." (Doc. 21-3, Ex. E, pp. 87-91, 99, 106, Witt Depo.). During this period, although there were no official or organized meetings, Riley, Witt, and Massey (some of the "decision makers") engaged in informal discussions with each other regarding Brewer's behavior. (Doc. 20, Ex. B., pp. 404-405.) Mr. Tiffin did

14

not participate in these discussions.  (Doc. 21-2, Ex. D, p. 23, Tiffin Depo.)

**Drug Test Results and Brewer's Termination**

On May 10, 2007, the day after the Belmont meeting and drug test, Brewer

provided Mills with his prescriptions for medications which contained Amphetamine and

Alprazolam Metabolite, the two positive readings on his drug test report.  (Doc. 21, Ex.

C, p. 150, Mills Depo.; Doc. 22-11, Ex. V, Drug Test Report; Doc. 22-13, Ex. X, Mills's

medication and diagnoses list.)  That day, at Riley's request, Mills used an online PDR to

look up the medications disclosed by Brewer; she then prepared a list of the medications,

putting the likely diagnoses beside each of the medications.  (Doc. 21, Ex. C, pp. 150-

152, 162, Mills Depo.; Doc. 22-13, Ex. X, Mills's medication and diagnoses list.)  Mills

then provided this information to Riley.  (Doc. 21, Ex. C, pp. 152-153, Mills Depo.)  On

May 17, 2007, Mills retrieved Brewer's drug test results, which had been finalized and

made available for computer download.  (Doc. 22-11, Ex. V, Drug Test Report; Doc. 21,

Ex. C, p. 24, Mills Depo.)  Brewer's drug test was negative for alcohol and opiates, and

nothing on the report suggested that Brewer was "self-medicating" or taking medications

other than as prescribed.  (Doc. 26-13, Ex. 8, pp. 99-100, Anakwenze Depo.)

On Monday, May 21, 2007, Mr. Tiffin, Massey, Witt, and Riley met to discuss

Brewer.  (Doc. 21-2, Ex. D, pp. 59-60, Tiffin Depo.; Doc. 21-3, Ex. E, p. 62, Witt Depo.;

Doc. 21-4, Ex. F, p. 101, Massey Depo.; Doc. 20, Ex.  B, p. 85, Riley Depo.)  Mills

attended the first part of this meeting; and, prior to any discussion of Brewer's

15

employment, at Riley's direction, Mills informed the group about Brewer's medications and the conditions for which they were usually prescribed.  (Doc. 21-2, Ex. D, pp. 59-60, 66, Tiffin Depo.; Doc. 20, Ex. B, pp. 42-44, Riley Depo.; Doc. 21-3, Ex. E, pp. 65-68, Witt Depo.; Doc. 21-4, Ex. F, pp. 84-85, Massey Depo.; Doc. 26-9, Ex. 4, Mills Termination Note; Doc. 21, Ex. C, pp. 168-169, 179-181, 225-226, Mills Depo.)  As requested, Mills also highlighted "abnormal" readings on the report.  (Doc. 21, Ex. C, p. 201, Mills Depo.)  Mills highlighted alcohol and informed those present that the test showed the presence of alcohol.[10]  (*Id.*, p. 216; Doc. 21-3, Ex. E, p. 68, Witt Depo.; Doc. 20, Ex. B, p. 92, Riley Depo.)  Mills even highlighted methamphetamine (i.e. "meth") as abnormal, though the test results indicate a "negative" reading.  (Doc. 21, Ex. C, pp. 192, 197, 201, 216, Mills Depo.; Doc. 22-11, Ex. V, Drug Test report.)  Mills discussed the drug test results, answered management's questions, and then left the meeting.  (Doc. 26-9, Ex. 4, Mills Termination Note; Doc. 21-3, Ex. E, p. 68, Witt Depo.)

The decision makers[11] present at the meeting concluded Brewer had an impairment at work issue and they were concerned about the safety of their workforce.  (Doc. 21-2, Ex. D, pp. 48-50, 63, 84-86, Tiffin Depo.)  Riley testified that retaining Brewer might jeopardize the manufacturing process; he also stated that the group discussed its concern

---

[10]  Mills later contacted the testing company and learned that the reading for alcohol, "0.02," should be interpreted as "negative" even if the value read "0.02."  (Doc. 21, Ex. C, p. 209, Mills Depo; Doc. 21-11, Ex. V, Test Results.)

[11]  Tim Tiffin was the final decision maker.  (Doc. 20, Ex. B, p. 30, Riley Depo; Doc. 21-2, Ex. D, p. 83, Tiffin Depo.)

that Brewer's retention might expose the company to civil liability.  (Doc. 20, Ex. B, pp. 36, 78-79, Riley Depo.)  During this meeting, they decided to terminate Brewer's employment.  (Doc. 20, Ex. B, p. 30, Riley Depo.; Doc. 21-2, Ex. D, p. 82, Tiffin Depo.; Doc. 21-3, Ex. E, p. 146, Witt Depo., Doc. 21-4, Ex. F, pp. 104-106, Massey Depo.)

Later that morning, Massey, Witt, and Riley met with Brewer to inform him of the company's decision.  (Doc. 21-4, Ex. F, p. 10, Massey Depo.; Doc. 21-3, Ex. E, pp. 150-52, Witt Depo.)  Massey and Witt accompanied Brewer to the warehouse and waited with him while he cleaned out his office and put his personal belongings in his car.  (Doc. 21-4, Ex. F, pp. 11-18, Massey Depo.)

### Post Termination

The day after his termination Brewer returned to the Plant in order to talk to Mr. Tiffin and "clear his name."  (Doc. 19, Ex. A, pp. 130-35, Brewer Depo.; Doc. 21-2, Ex. D, pp. 117-118:, Tiffin Depo.)  During this meeting Brewer gave Mr. Tiffin a packet of materials, which included a note from his pastor, a printout from his pharmacies, and a letter from his doctor.  (*Id.*)  Brewer asked Mr. Tiffin for the opportunity to have further discussions with Mr. Tiffin and Riley, and he suggested that he could talk with his doctor about changing his medications.  (*Id.*)  Mr. Tiffin indicated that he would review the materials and he extended Brewer the opportunity to return to an hourly, non-supervisory, position at Tiffin after sixty days, provided that Brewer was able to "clean himself up" and pass a drug test.  (Doc. 21-2, Ex. D, p. 109, Tiffin Depo.; Doc. 20, Ex. B, p. 236,

Riley Depo.; Doc. 26-11, Ex. 6, p. 2, Riley Termination Memo.; Doc. 19, Ex. A, pp. 134-

35, Brewer Depo.; Doc. 22-7, Ex. R, p. 4, Brewer EEOC Charge.)

## III. DISCUSSION

### A.  ADA Discrimination Claim

Brewer claims that he was wrongfully terminated on the basis of a perceived

disability.  The ADA, provides that "[n]o covered entity shall discriminate against a

qualified individual with a disability because of the disability of such individual in regard

to . . . discharge . . . and other terms, conditions, and privileges of employment.  42

U.S.C. § 12112(a).  Under the ADA, the term "disability"with respect to an individual is

defined as "a physical or mental impairment that substantially limits one or more of the

major life activities of such individual," or "being regarding as having such an

impairment."  42 U.S.C. § 12102 (2)(A)(C); *Williams v. Motorola, Inc.*, 303 F.3d 1284,

1290 (11th Cir. 2002) ("[A] plaintiff may maintain a claim . . . of being perceived as

disabled without proof of actually being disabled.").

An ADA plaintiff may prove a claim for discriminatory discharge by presenting

direct evidence of discrimination or through the use of circumstantial evidence.  *Wilson v.*

*Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1421 (M.D. Ala. 1996) (citations

omitted); *See Haynes v. W.C. Caye* Co., 52 F.3d 928, 931 (11th Cir. 1995).  Direct

evidence is "that evidence which, if believed, 'establishes discriminatory intent without

inference or presumption.'" *Gayfers*, 953 F. Supp. at 1415 n.10 (citing *Clark v. Coats &*

18

*Clark*, 990 F.2d 1217, 1226 (11th Cir. 1993)).  The plaintiff in a direct evidence case "must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony." *E.E.O.C. v. Alton Packaging Corp.* 901 F.2d 920, 923 (11th Cir. 1990)  "If the plaintiff proves such evidence and the trier of fact believes it, the defendant must prove by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved." *Id.*

"When direct evidence of discrimination has been introduced, the lower court must, as an initial matter, specifically state whether or not it believes plaintiff's proffered direct evidence of discrimination." *Id.* at 924 (quoting *Thompkins v. Morris Brown College*, 752 F.2d 558, 564 (11th Cir.1985).  Motive or intent is seldom capable of proof by direct evidence.  *Perryman v. Johnson Prods, Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983).  "Evidence that only suggests discrimination, or that is subject to more than one interpretation does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1190 (11th Cir. 1997) (citations omitted).

Brewer contends that he has introduced direct evidence that Tiffin "acted explicitly because it believed Brewer was impaired from the abuse of his prescription medications." (Doc. 27, p. 23.)  Without citation to the record, identifying "direct testimony," Brewer argues that direct evidence supports a conclusion that Tiffin perceived Brewer as "substantially limited based on drug abuse or addiction."  (*Id.*)  The court disagrees. Portions of Mr. Tiffin's testimony, taken collectively, state that the "combination of drugs

19

. . . caused [Brewer] to come to work impaired," which "violated policy," and provoked Mr. Tiffin's "concern that "Brewer might be abusing his medication," and "need[ed] to seek treatment for drug problems." (Doc. 21-2, Ex. D, pp. 82, 90, 105, Tiffin Depo.) However, this evidence is insufficient to prove the existence of a discriminatory motive, and thus does not constitute direct evidence of discrimination. First, Mr. Tiffin's "statements" are merely suggestive of discriminatory motive, especially given the use of the word "might." *Merritt*, 120 F.3d at 1189. Second, the phrases, "might be abusing his medication," and "need to seek treatment for drug problems," were framed by plaintiff's counsel, and merely affirmed by Mr. Tiffin in providing deposition responses. (Doc. 21-2, Ex. D, p. 105, Tiffin Depo.) This evidence is relevant to motive, however, it is more appropriately deemed circumstantial or indirect evidence, and as such, may properly be used by Brewer under a burden-shifting analysis of proof.

### 1. Prima Facie Case

The Eleventh Circuit has held that the burden-shifting framework, established in the context of Title VII employment discrimination claims by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), is applicable to ADA claims. *Holy v. Clairson Indus., LLC.*, 492 F.3d 1247, 1255 (11th Cir. 2007). Once the plaintiff has proven a prima facie case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment action. *See Burdine*, 450 U.S.

20

at 253.  "To satisfy the intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).  If the defendant accomplishes this, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's alleged reason or reasons were a pretext for unlawful discrimination.  *See Burdine*, 450 U.S. at 253.

The employee bears the burden of establishing a prima facie case of disability discrimination by a preponderance of the evidence.  *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *Reed v. Heil Co.*, 206 F.3d 1055, 1063 (11th Cir. 2000)  To meet this burden, Brewer must prove 1) he has a disability (real or perceived); 2) he is otherwise qualified to perform the essential functions of the job; and 3) he was subjected to unlawful discrimination because of his disability (real or perceived).  *Motorola*, 303 F.3d at 1290; *Davis*, 205 F.3d at 1305.

**a.  Otherwise Qualified**

Tiffin first argues that Brewer cannot satisfy the second prong of this test and contends that "Brewer was impaired at work, unable to perform the essential functions of his position, and not 'otherwise qualified.'" (Doc. 23, p. 16.)  A "'qualified individual with a disability' is an individual with a disability who, with or without accommodation can perform the essential functions of the employment position that such an individual

holds or desires."  42 U.S.C. § 12111(8); *Davis*, 205 F.3d at 1305.  Brewer did not seek

accommodation, therefore he must show that he can perform the essential functions of his

job without accommodation. *Id.*; *see Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255-

56 (11th Cir. 2001) ("The plaintiff bears the burden of identifying an accommodation,

and demonstrating that the accommodation allows him to perform the job's essential

functions."); *D'Angelo v. Conagra Foods, Inc.*, 422 F.3d 1220, 1240 (11th Cir. 2005)

(concluding that "the ADA, by its plain language, requires employers to provide

reasonable accommodation for employees they regard as disabled").

　　　Determining "[w]hether a function is essential is evaluated on a case by case basis

by examining a number of factors."  *Davis*, 205 F.3d at 1305.  The ADA directs that

"consideration shall be given to the employer's judgment as to what functions are

essential, and if an employer has prepared a written description before advertising or

interviewing applicants for the job, this description shall be considered evidence of the

essential functions of the job."  42 U.S.C. § 12111(8).  Other factors for consideration

include "1) the amount of time spent on the job performing the function, 2) the

consequences of not requiring the incumbent to perform the function, 3) the terms of the

collective bargaining agreement, 4) the work experience of past incumbents in the job,

and 5) the current work experience of incumbents in similar jobs."  29 C.F.R. §

1630.2(n)(3)(iii)-(vii); *Davis*, 205 F.3d at 1305 (determining that overtime work was an

essential function of plaintiff's job).

The parties do not dispute that Tiffin required safe performance of the essential functions of the job. *See Weimer v. Honda of America Mfg., Inc.*, 356 Fed. Appx. 812, 818 (6th Cir. 2009) (recognizing that the ability to perform one's job safely may be an essential function). Tiffin points out that its Job Posting lists "safety" as a required behavioral trait. (Doc. 22-6, Ex. Q.) In evaluating whether Brewer has demonstrated that he safely performed the essential functions of his job, the court, first, further examines the Job Posting, which enumerates the tasks associated with the Warehouse Supervisor position. (*Id.*)

Tiffin's Job Posting lists the following "job functions" 1) analyze production orders and create a work schedule, 2) compute stock and supply amounts, 3) interpret product specifications and blueprints, 4) plan flow of materials, 5) interface with others to meet customer needs, 6) direct workers to adjust procedures, 7) develop measures to improve production, 8) suggest changes to increase efficiency, 9) maintain records, 10) determine capital requirements for machines and tools, 11) estimate, request, and inspect material. (Doc. 22-6, Ex. Q.) From this, the court finds that material questions of fact remain as to the essential functions of Brewer's job and whether he performed them safely. Notably absent from the Job Posting's listed tasks is the operation of a forklift or a golf-cart. Also, Mr. Tiffin admitted that he could not "recall anything other than the operation of vehicles being a safety concern regarding Mr. Brewer at any time before he was terminated." (Doc. 21-2, Ex. D., p. 53, Tiffin Depo.) At oral argument, plaintiff's

counsel additionally argued that Brewer was able to perform the essential functions of his job without the aid of these vehicles.  Finally, the record does not reflect that Brewer failed to keep accurate records, failed to effectively route parts through the warehouse, failed to interpret blueprints, or otherwise significantly failed to perform the long list of tasks that comprise the essential functions of his job.

Turning to the argument of the parties, Brewer contends that "[d]efendant offers no evidence that Brewer cannot do the job."  (Doc. 27, p. 22.)  The burden to prove job qualification lies with Brewer.  *Davis*, 205 F.3d at 1305.  In his brief in opposition to defendant's Motion for Summary Judgment, Brewer states that he "has presented evidence that he is qualified to perform the essential functions of a warehouse supervisor, including his own testimony and that of his physician and supervisors at Tiffin."  (Doc. 27, p. 22.)  Brewer's supervisors testified that he was doing a good job and admit that, prior to the termination decision, they never reported concerns related to Brewer's job performance to Tim Tiffin or Riley.

Tiffin's argument – that Brewer did not safely perform the essential functions of the job – centers on its observations of Brewer's "sleepiness," "strange behavior," "slurred" or "rambling" speech, "being unsteady on his feet," having one "close call" while driving a car, and making a bad decision regarding storage in the warehouse.  Tiffin maintains that it did not terminate Brewer for failing a drug test; instead, Tiffin states it terminated him because he was impaired and a threat to safety.  (Doc. 23, p. 27.)  The

24

issue before the court is whether these observed instances of "alleged impairment" detract from Brewer's performance of the essential functions of his job.  *See Overton v. Reilly*, 977 F.2d 1190, 1195 & n.5 (7th Cir. 1992) (recognizing that if "sleepiness is a function of [an employee's] disability (or, more properly, of the treatment for his disability) and he can still perform the essential functions of his job, then he may still be viewed as "qualified" under the Rehabilitation Act");[12] *Halsey v. JP Morgan Chase Bank*, No. C 08-01335 JSW, 2009 WL 3353459, at *5 (N.D. Cal. Oct. 16, 2009) (determining that employer [had] not demonstrated that sleeping or nodding off during a training session rendered [plaintiff] unable to perform the essential functions of [his job]"); *E.E.O.C. v. Kinney Shoe Corp.* 917 F. Supp. 419, 427 (W.D. Va. 1996) (concluding, in case where employee suffered from temporary epileptic seizures, that "the fact finder must examine the specific facts of each case to determine if temporary incapacitation renders an individual unqualified for the position at issue").  A reasonable jury could conclude that, despite Tiffin's observations of instances of impairment, Brewer safely performed the essential functions of his job.

Viewing the evidence, and all reasonable inferences therefrom, in the light most favorable to Brewer, the court finds that Brewer has met the first element of his case by

---

[12]  The Rehabilitation Act and the ADA utilize similar statutory language and are generally construed similarly. *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in [the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter provides...."); 42 U.S.C. § 12134(b) (directing ADA regulations to be consistent with Rehabilitation Act regulations); *see also Cash v. Smith*, 231 F.3d 1301, 1305 & n.2 (11th Cir.2000) ("Cases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice-versa.").

offering prima facie evidence that he is otherwise qualified to perform the essential functions of his job.

### b.  Regarded as Disabled

Tiffin also contends that Brewer fails in his prima facie proof that Tiffin regarded him as disabled on the basis of mental disability, (doc. 23, p. 21), or drug addiction, (*Id.*, p. 22).  The EEOC regulations interpreting the ADA recognize both mental illness and drug abuse as physical or mental impairments.  29 C.F.R. § 1630.2(h)(2); 28 C.F.R. § 35.104(1)(ii); *Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002) (noting that the ADA protects individuals who are "erroneously regarded as using drugs when they are not").  The regulations explain that to be regarded as impaired means that an individual:

> (1)  Has a physical impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such a limitation;
>
> (2)  Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3)  Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. § 1630.2(l).  Further, in determining whether an impairment is "substantially limiting," the regulations state that one of the factors to be considered is "[t]he duration or expected duration of the impairment."  29 C.F.R. § 1630.2(j)(2)(ii); *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999) ("An employee who is perceived by his employer as having only a temporary incapacity to perform the essential functions of his job is not

perceived as 'disabled' as defined by the Act.").

Working is a major life activity. *Id.* An employer regards an employee as substantially limited in the major life activity of working if it considers him "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. 1630.2(j)(3)(i). The Eleventh Circuit has held that "manufacturing is a class of jobs or a broad range of jobs for disability purposes." *Rigby v. Springs Indus., Inc.*, 156 Fed. Appx. 130, 132 (11th Cir. 2005) (citing *D'Angelo*, 422 F.3d at 1220). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. 1630.2(j)(3)(i). "Thus, an impairment must preclude – or at least be perceived to preclude – an individual from more than one type of job, even if the job foreclosed is the individual's job of choice." *Carruthers*, 357 F.3d at 1216 (citation omitted); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998).

Brewer asserts that "Tiffin perceived [him] as unable to do not only supervisory work but also the entry-level manual labor jobs." (Doc. 27, pp. 20-21.) Tiffin argues that, because it offered Brewer re-employment after 60 days, albeit in a non-supervisory capacity, it did not impermissibly perceive Brewer as being unable to perform a broad range of jobs within the plant, and "it perceived Brewer's issues to be short lived and not a long term employability issue." (Doc. 23, p. 26.)

The parties do not dispute that Brewer's return was conditioned upon his ability to pass a drug test.  Brewer argues that Tiffin's offer "makes no difference because a reasonable juror can conclude Brewer could never pass a drug screen at Tiffin while taking his prescribed medications."  (Doc. 27, p. 21.)  Mr. Tiffin testified that to return to work Brewer would have to "clean up," and he admits that his use of that term is "in reference to the drugs that showed up on [Brewer's] drug screen."  (Doc. 21-2, Ex. D, pp. 109-117, Tiffin Depo.)  It is reasonable to infer that, given Brewer's history of mental illness, the treatment for which includes long term use of prescribed medications, Brewer would not, or could not, abandon that protocol to satisfy Tiffin's requirement.  A jury could reasonably conclude that Tiffin effectively barred Brewer from employment in any position, within a broad range of jobs, and that Tiffin regarded Brewer as substantially limited in the major life activity of working.

Tiffin also asserts that "[t]he decision makers denied any knowledge or understanding that Brewer was suffering from a mental condition or had such a diagnosis."  (Doc. 23, p. 22.)  Arguing that Brewer has offered "scant" or "weak" evidence of perceived disability, Tiffin directs the court to *Watson v. City of Miami Beach*, 177 F.3d 932 (11th Cir. 1999).  (*Id.*)  In that case, the court concluded that personality conflicts do not rise to the level of disability–or mental impairment; thus, plaintiff failed to prove his mental disability claim despite *plaintiff's* evidence that co-workers regarded him as "paranoid," "disgruntled," "oppositional," "difficult to interact

28

with," "unusual," "suspicious," "threatening," and "distrustful." *Watson*, 177 F.3d at 935 (emphasis added). Tiffin's assertion, denying knowledge, is not consistent with the record, and its reliance on *Watson* is unavailing.

First, Brewer has submitted ample direct testimony by decision makers that they were apprised of the possible medical conditions underlying, or generally associated with, his prescribed medications. Second, unlike *Watson*, in this case, whether or not Brewer's "impaired" behavior rises to the level of mental illness is not at issue; rather, at issue is whether Tiffin, on the basis of its receipt of information relating possible medical conditions, perceived Brewer as having a mental impairment. A reasonable jury could infer that the decision makers regarded Brewer as having a mental disorder that substantially limited his ability to work in a broad class of jobs.

The court finds that Brewer has proffered sufficient evidence that he was a qualified individual, that Tiffin regarded him as disabled, and, on that basis, made its decision to terminate him. Thus, Brewer has established his prima facie case..

## 2. Employer's Non-discriminatory Reason and Proof of Pretext

As the legitimate nondiscriminatory reason for its employment decision, Tiffin states that Brewer was impaired, which violated both Warehouse Supervisor duties and basic workplace rules, and "subjected other Tiffin employees to the risk of serious injury and death." (Doc. 23, pp. 26-27.) Brewer challenges Tiffin's proffered reason on two fronts.

Brewer contends that Tiffin's belief – that retaining Brewer posed a direct threat to employee safety – fails to satisfy Tiffin's burden of production under the burden shifting framework. (Doc. 27, p. 24.) As support, Brewer relies upon *Lowe v. Alabama Power Company*, which states, "[A] good-faith belief that a significant risk of harm exists is insufficient if it is not grounded in medical or other objective scientific evidence." 244 F.3d 1305, 1308 (11th Cir. 2001). Brewer contends, that under *Lowe*, "[Tiffin] must point to particularized facts about [Brewer's] condition to support its decision," and may not rely upon stereotypical assumptions or related perceptions of limitations. *Id.* Brewer points out that Tiffin did not rely on any medical opinion or evidence to show that Brewer was a direct threat. (Doc. 27, p. 25.) Nevertheless, the court does not reach the conclusion that Tiffin has not articulated a legitimate nondiscriminatory reason.

At issue is where the burden of proof lies. The Eleventh Circuit has held, "The employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir, 1996). This point of law is undisturbed by *Lowe.* The *Lowe* court expressly stated, "[W]e do not revisit the issue of where the burden of proof should rest regarding whether the employee poses a direct threat." *Lowe*, 244 F.3d at 1308 n.1 (citing *Am. Nonwovens*, 97 F.3d at 447). In *Lowe*, the lower court assumed a prima facie case; therefore, on review, the Eleventh Circuit addressed only the sufficiency of the defendant's direct threat defense. In this case, the court recognizes that

fact issues exist as to whether Brewer posed a direct threat to employee safety, and the court finds that Brewer retains the ultimate burden of proving that he did not.  "Though the burden of showing that an employee is a direct threat typically falls on the employer, 'where the essential job functions necessarily implicate the safety of others, then the burden *may* be on the plaintiff to show that [he] can perform those functions without endangering others."  *Justice v. Crown Cork and Seal Co.*, 527 F.3d 1080, 1091 (10th Cir. 2008) (addressing proof of direct threat in context of "regarded as disabled" case) (emphasis added); *c.f. E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997) (noting that where direct threat is not tied to issue of essential job functions–and is purely a matter of defense– defendant would bear the burden).

Finding that Tiffin has met its burden to articulate a legitimate, nondiscriminatory reason for Brewer's termination, the court turns to Brewer's argument that the proffered reason is a pretext for discrimination.  A plaintiff raises a genuine issue of material fact concerning pretext if the plaintiff casts sufficient doubt on the defendant's proffered reason to permit a reasonable fact finder to conclude that the employer's proffered reason was not what actually motivated its conduct.  *Corbitt v. Home Depot U.S.A.*,589 F.3d 1136, 1162 (11th Cir. 2009) (citing *Crawford v. Carroll*, 599 F.3d 961, 976 (11th Cir. 2008)).  An employee may show pretext "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Jackson v.*

31

*Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).  "'A plaintiff

withstands summary adjudication by producing sufficient evidence to allow a reasonable

finder of fact to conclude that the defendant's articulated reasons for its decision are not

believable.'"  *Id*. (quoting *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994)).  In

reviewing a summary judgment motion, "'the district court must evaluate whether the

plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action that a reasonable factfinder could find them unworthy of credence.'" *Id.* (quoting

*Combs v. Plantation Patterns, Meadowcraft Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

Brewer has produced such evidence.  Here, plaintiff has offered evidence from which a

reasonable jury could find that defendant did not have a good faith belief that plaintiff

would pose a direct threat to the safety of others.

Brewer presented evidence that Mr. Tiffin attributed Brewer's impairment to

overuse of prescription medications.  Mr. Tiffin testified: "It seemed to me that the

medications taken as prescribed should not produce the impairment I had observed."

(Doc. 22-4, Ex. O, p. 3, Tiffin Aff.)  Mr. Tiffin also advised Brewer to "seek treatment

for his drug problem."  (*Id.*)  This is highly suggestive circumstantial evidence from

which a jury could infer that discriminatory animus based upon a perceived drug

addiction more likely motivated Tiffin's decision.

Tiffin also reported to the Alabama Unemployment Agency only that Brewer was

32

terminated for a "failed drug screen;" nevertheless, Tiffin maintains that "Tiffin's EEOC Position Statement, Mr. Tiffin's Affidavit, and the unanimous testimony of the Tiffin decision makers establish that impairment was the basis for Tiffin's decision." (Doc. 23, p. 27.) Riley, one of those decision makers, testified "I don't think that the drug test had anything to do with his termination." (Doc. 20, Ex. B, p. 246, Riley Depo.) However, while Riley testified that the drug test results were "not significant in the decision to terminate [Brewer]," (*Id.*), he also documented in a human resources memo that he, along with Witt and Massey, met with Jason in Riley's office and went over the results of the drug test with Brewer. (*Id.*, p. 235.) Riley "informed [Brewer] that if he would clean up and could pass a drug test, we would, after 30-60 days, put him back on the floor." (*Id.*) The various responses regarding whether Tiffin relied upon, or acted without respect to, the drug test constitute the "inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" from which a reasonable factfinder could find them unworthy of credence. *Combs*, 106 F.3d at 1538.

Brewer next argues pretext may be inferred because "decision makers learned [Brewer] took medications for multiple psychiatric conditions minutes before firing him." (Doc. 27, p. 27.) Riley testified that Nurse Mills addressed "the entire group" of decision makers at the meeting just before Brewer's termination and that Mills "went down list of medications and said in a very brief way as she called out each one, 'this would be prescribed for ["X"]' and she said 'Generally, this would be prescribed for ["Y"].'" (Doc.

20, Ex. B, pp. 43-44, Riley Depo.)  Riley admits he asked Mills what the medications

were prescribed for.  (*Id*.)  Mills provided Riley with the medication and diagnoses list,

(doc. 21, Ex. C, pp. 152-153, Mills Depo.), and Mr. Tiffin admits that information

provided by [Riley] "via [Ms. Mills]" factored into his decision.  (Doc. 21-2, Ex. D., p.

58, Tiffin Depo.)

     Accepting Brewer's evidence, and resolving all justifiable inferences in his favor,

the court finds that Brewer has met his burden to produce sufficient probative evidence

from which a reasonable jury could conclude that Tiffin's reasons for terminating Brewer

were pretext for discrimination in violation of the ADA.  Therefore, Tiffin is not entitled

to judgment as a matter of law.

## B.  Medical Inquiry Claim

     Brewer amended his Complaint, adding Count II, and primarily claims that 1)

Tiffin violated the ADA by terminating Brewer based upon medical information learned

in conjunction with Brewer's drug test, 2) Tiffin failed to use a qualified professional to

evaluate test results, thus the test was a medical examination that was not job-related and

consistent with business necessity, 3) Tiffin failed to keep medical information

confidential, and 4) Tiffin improperly used medical information to screen Brewer, and the

criteria applied was not job related or consistent with business necessity.  (Doc. 13 at ¶¶

13-22.)  In its Motion, Tiffin claims that it is entitled to judgment as a matter of law on

Brewer's medical inquiry claim because the May 9, 2007 drug test was "not a medical

examination and these results were shared only among Brewer's supervisory chain of command."  (Doc. 23, p. 28.)

### a.  Medical Exam

Section 12112(d)(4), entitled **"Prohibited Examinations and Inquiries,"** generally prohibits medical examinations and inquiries focused on disability information, however, it allows such examinations and inquires that are "shown to be job-related and consistent with business necessity."  Additionally, 42 U.S.C. § 12114(d)(1) states that "a test to determine illegal use of drugs shall not be considered a medical examination.  *See also* 29 C.F.R. 1630.16 (c).  Tiffin asserts that the test administered to Brewer on May 9, 2007 falls within both the illegal drug use, as well as the job-related and consistent with business necessity, exceptions.  (Doc. 23, p. 29.)

First, Tiffin contends that its observations of Brewer's "disoriented and strange behavior during a training session" earlier that day, properly supported its determination to administer a reasonable suspicion drug test that was, by definition, not a medical examination.  (*Id.*)  Second, Tiffin argues that the drug test, even if deemed a medical exam, met permissible job related and business necessity criteria in that 1) it was required in order to determine if Brewer could perform job-related duties, 2) Tiffin had a legitimate, nondiscriminatory reason to question Brewer's capacity to perform his duties, and 3) the exam was a "reasonably effective method" of achieving the business necessity. *See Mickens v. Polk County Sch. Bd.*, 430 F. Supp. 2d 1265, 1279 (M.D. Fla. 2006)

(citing *Conroy v. New York State Dept. of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003));

*Watson v. City of Miami Beach*, 177 F.3d 932, 935-936 (11th Cir. 1999) (finding fitness

for duty and tuberculosis exams were job-related and consistent with business necessity).

Brewer does not rebut Tiffin's assertions that the drug test was not a medical

examination, or that reasonable suspicion prompted its administration, rather he directs

the court to EEOC enforcement guidelines which state that a urine test to check for

alcohol is a medical exam.  (Doc. 27, p. 30.)  Without further argument, or reference to

evidentiary submissions, Brewer's effort is insufficient to defend against a motion for

summary judgment.[13]  The court notes that the guidelines treat alcohol and drug detection

similarly, and provide that: "Employers also may maintain and enforce rules prohibiting

employees from being under the influence of alcohol in the workplace and may conduct

alcohol testing for this purpose if they have a reasonable belief that an employee may be

under the influence of alcohol at work."  EEOC, Publ'n No. 915.002, *Enforcement*

*Guidance: Disability-Related Inquires and Medical Examinations of Employees Under*

*the Americans with Disabilities Act*, 2 & n.26 (2000) (available at

http://www.eeoc.gov/policy/docs/guidance-inquiries.html).  Accordingly, the court finds,

as a matter of law, that Tiffin did not impermissibly administer a drug test to Brewer on

---

[13]  Brewer's Affidavit testimony, which contains denials of impairment and offers alternative explanations for Tiffin's observations, (doc. 26-7, ¶¶ 2, 3, 10), does not impact the court's examination of whether Tiffin had reasonable suspicion to perform a drug/alcohol test. *See Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citing *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n. 2 (11th Cir. 1989) ("That the employee did not in fact engage in misconduct reported to the employer is irrelevant to the question of whether the employer believed the employee had done wrong.")).

May 9, 2007, in violation of the ADA.

**b. Confidentiality**

29 C.F.R. § 1630.16 (c)(3), governing confidentiality related to permissible use of

drug testing, provides that: "Any information regarding the medical condition or history

of any employee or applicant obtained from a test to determine the illegal use of drugs,

except information regarding the illegal use of drugs, is subject to the requirements of §

1630.14(b) (2) and (3) of this part."  Section 1614(b)(2) and (3), in turn, states:

> (2) The results of such examination shall not be used for any purpose
> inconsistent with this part.
>
> (3) Medical examinations conducted in accordance with this section do not
> have to be job-related and consistent with business necessity.  However, if
> certain criteria are used to screen out an employee or employees with
> disabilities as a result of such an examination or inquiry, the exclusionary
> criteria must be job-related and consistent with business necessity, and
> performance of the essential job functions cannot be accomplished with
> reasonable accommodation as required in this part. . . .

In his argument that Tiffin failed to keep his medical history confidential, Brewer

relies upon additional language contained in section 1630.14(b)(1)(i), which states:

> (1) "Information obtained under [an employment entrance examination]
> regarding the medical condition or history of the applicant shall be collected
> and maintained on separate forms and in separate medical files and be
> treated as a confidential medical record, except that
>
> (i) Supervisors and managers may be informed regarding necessary
> restrictions on the work duties of the employee and necessary
> accommodations.

Brewer contends that Tiffin violated ADA medical inquiry provisions because

Massey and Witt were provided with medical information, as opposed to the limited,

permissible, information pertaining to restrictions, if any, on Brewer's work duties.

However, as outlined above, Brewer relies upon language that is related to "specially

permitted" "medical entrance examinations and inquiries," which, unlike §§ 1614(b)(2)

and (3), has not been incorporated by reference into the regulations governing reasonable

suspicion drug tests.  In sum, Tiffin's obligation under the ADA is to keep Brewer's

medical information confidential.

Brewer correctly points out that under the annotations to § 1630.16(c):

> If the results reveal information about an individual's medical condition
> beyond whether the individual is currently engaging in the illegal use of
> drugs, this additional information is to be treated as a confidential medical
> record.  For example, if a test for the illegal use of drugs reveals the
> presence of a controlled substance that has been lawfully prescribed for a
> particular medical condition, this information is to be treated as a
> confidential medical record.

Brewer asserts that Tiffin disclosed Brewer's medical condition to Tiffin

management *and employees*."  (Doc. 27, p. 32.)  The record is clear that Massey and Witt

were included from the outset in decisions related to Brewer's termination.  Thus, they

bear the same duty of confidentiality.  However, Brewer has failed to identify any breach

of confidentiality, or dissemination of his medical information beyond the decision

makers.[14]  *See Downs v. Massachusetts Bay Transp. Authority*, 13 F. Supp 2d 130, 141-

---

[14]  At oral argument of Tiffin's Motion for Summary Judgment, Brewer was unable, when
directly asked by the court, to identify a single employee, by name, to whom Tiffin impermissibly
related Brewer's confidential medical information.  The court also notes that the record reflects
that Brewer himself disclosed to warehouse employee Miller that he used medications.  (Doc. 21-
7, Ex. I, P. 45, Miller Depo.)

142 (D. Mass. 1998) (holding employer violated ADA by releasing medical information to worker's compensation claims agent).  Tiffin is entitled to judgment as a matter of law on Brewer's claim that Tiffin violated the ADA with respect to confidentiality of his medical information.

### c. Employee Screening

Brewer's final argument, that Tiffin impermissibly "impose[d] a safety requirement that screens out or tends to screen out an individual with a disability is, likewise, unavailing.  (Doc. 27, p. 31.)  Again. Brewer directs the court to a direct threat analysis, and argues that Tiffin bears the burden to demonstrate that Brewer is a direct threat in order to show that its safety requirement is job-related and consistent with business necessity.  (*Id.*, pp. 31-32.)

A "qualification standard" may include requirements concerning safety.  29 C.F.R. § 1630.2 (q) ("Qualification standards means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired.")  As Tiffin points out, it may be a defense to a charge that an employer has impermissibly utilized "qualification standards" or "selection criteria," which tend to screen out disabled individuals, to show that the application of such requirements is job-related and consistent with business necessity.  29 C.F.R. § 1630.15 (b)(1).  Continuing, section 1630.15 (b)(2) provides: "The

39

term 'qualification standard' may include a requirement that an individual shall not pose a direct threat to the heath and safety of the individual or others in the workplace."  The court has already discussed the burden of proof related to direct threat.[15]  The court now adds that reading sections 1630 (b)(1) and (b)(2) in concert, Tiffin may impose safety as a job requirement, which may include that an employee not pose a direct threat; however, Tiffin need not, as Brewer contends, prove that Brewer is a direct threat in order to satisfy its burden of demonstrating that "safety" is job-related and consistent with business necessity.

Tiffin argues by analogy that employers are "caught between a rock and a hard place" – employee protections under the ADA, on the one hand, and employer's needs, on the other.  Tiffin cites *Mickens v. Polk County School Board*, which states: "Employers must be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims."  430 F. Supp. 2d 1265, 1280 (M.D. Fla. 2006) (quoting *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998)). In this case, no reasonable jury could conclude that Tiffin's administration of a reasonable suspicion drug test was inconsistent with business necessity or contrary to the regulations that expressly permit such an inquiry by an employer.  *See* 29 C.F.R. § 1630.16 (c)(1). Accordingly, the court is of the opinion that summary judgment on Brewer's claim that Tiffin violated ADA medical examination and inquiry provisions is due to be granted.

---

[15] *See* discussion *supra* Part III.A.2.

40

## IV  CONCLUSION

For the foregoing reasons, the court is of the opinion that Tiffin's Motion for Summary Judgment, (doc. 17), is due to be denied with respect to Brewer's ADA discrimination claim, and is due to be granted with respect to Brewer's ADA Medical Examination and Inquiry violation claim.  An order granting in part and denying in part Tiffin's Motion will be entered contemporaneously with this opinion.

**DONE** this the 29th day of July, 2010.

_Sharon Lovelace Blackburn_
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE